**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                  )
MELVIN PORTER,                                    )
                                                  )
            Plaintiff,                            )
                                                  )
      v.                                          )    Civil Action No. 04-1440 (RBW)
                                                  )
ALONZO FULGHAM, ACTING                            )
ADMINISTRATOR, UNITED STATES                      )
AGENCY FOR INTERNATIONAL                          )
DEVELOPMENT,                                      )
                                                  )
            Defendant.                            )
_____)

## <u>MEMORANDUM OPINION</u>

Plaintiff Melvin Porter brings this action against his employer, the United States Agency for International Development ("Agency"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-3(a), 16(a) (2000) ("Title VII"), alleging that the Agency engaged in discriminatory employment practices against him based upon his race and gender, as well as retaliatory employment practices based on his participation in protected activity, i.e., his 2001 lawsuit against the defendant for illegal employment practices under Title VII and related Equal Employment Opportunity ("EEO") activity.  This matter is now before the Court on the defendant's motion for summary judgment, Defendant's Motion for Summary Judgment ("Def.'s Mot."), which the plaintiff opposes, Opposition of Plaintiff Melvin C. Porter to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n").[1]  For the following reasons, the Court must award summary judgment to the Agency.

---

[1]       The defendant filed a reply to the plaintiff's opposition, Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Def.'s Reply"), which the Court has also considered in resolving this motion.

## I. BACKGROUND

Viewing the evidence in the light most favorable to the plaintiff, the facts underlying this lawsuit are the following.

The plaintiff, an African-American male, was employed in the Agency's Office of Human Resources from 1985 to 1995, until being transferred to the Agency's Bureau of Policy and Program Coordination where he was assigned when this case was filed.  Second Amended Complaint ("Second Am. Compl.") ¶¶ 6, 8.  The plaintiff joined the Agency in 1985 as a GS-13 grade level employee, and was elevated to the GS-14 grade level after two years; however, since 1987, his pay grade level has not been increased.  Id. ¶ 8.

Since 1988, the plaintiff alleges that the Agency's acts of discrimination and retaliation have stymied his advancement.  And, between 1988 and 1991, the plaintiff filed four EEO complaints alleging that the Agency committed various discriminatory and retaliatory acts against him based upon his race and gender, and in response to his complaints against the Agency.  Id. ¶¶ 9-10.  The Agency settled the plaintiff's first round of complaints in 1992, awarding him monetary damages, a retroactive temporary promotion, training, and attorneys' fees.  Id. ¶ 10.  Following the settlement, the plaintiff filed three additional EEO complaints over the next several years against the Agency, again alleging discrimination and retaliation.  Id. ¶ 11. In 1995, the Agency settled the plaintiff's second round of complaints, agreeing to transfer him from the Office of Human Resources to the Bureau for Policy and Program Coordination, as well as awarding him additional "compensatory damages, a revised performance appraisal, a retroactive merit increase and performance award, and attorneys' fees."  Id.

In 2000, the plaintiff, frustrated that he still had not been promoted to the GS-15 level, sought additional relief in this Court.  Id. ¶ 13; see generally Complaint ("Compl."), Porter v. U.S. Agency for Int'l Dev. ("Porter I"), Civ. No. 00-1954 (D.D.C. Aug. 11, 2000); First Amended Complaint ("Am. Compl."), Porter I (D.D.C. May 2, 2001).  On June 5, 2002, a jury in that case found for the plaintiff on two of the six counts of his amended complaint, specifically finding that the defendant had engaged in "retaliation in connection with the [d]efendant's decision[s] not to select [the plaintiff]" for two positions for which he applied in 1998.  Jury Verdict at 2, Porter I (D.D.C. June 5, 2002).  The plaintiff requested and the Court entered a judgment in his favor, which, among other things, forbid the Agency from engaging in any further retaliation against the plaintiff.  Judgment at 2, Porter I (D.D.C. Feb. 3, 2003); Memorandum & Order at 1-2, Porter I (D.D.C. Feb. 3, 2003).

After receiving the partially favorable jury verdict in Porter I and the issuances of an accompanying order from the Court which forbid the Agency from retaliating against him, on June 24, 2003, in post-trial proceedings, the plaintiff filed a motion requesting that the Agency show cause why it should not be found in violation of the Court's 2003 order enjoining the Agency from retaliating against him based on what the plaintiff characterized as "two adverse employment actions."  Plaintiff's Memorandum in Support of His Motion for an Order to Show Cause Why Defendant Should Not be Held in Contempt and Authorizing Plaintiff to Take Discovery ("Pl.'s Show Cause Mem.") at 2, Porter I (D.D.C. June 24, 2003).  Namely, that the plaintiff claimed that the Agency's decision not to grant him a 2001 performance bonus and his receipt of a "Needs Improvement" assessment for his 2002 performance amounted to retaliation. Id.  While the Court granted the motion to the extent that it compelled the Agency to respond,

Order, Porter I (D.D.C. June 27, 2003), after reviewing the evidentiary support offered by both parties, the Court discharged the show cause order on the merits and denied the plaintiff's request to conduct discovery with regards to the two purported adverse employment actions, Order ¶ 2, Porter I (D.D.C. Nov. 25, 2003); see also Order at 1, Porter I (D.D.C. May 25, 2005).

Meanwhile, throughout the pendency of Porter I, the plaintiff continued to apply for GS-15 grade level positions for which he was not selected by the Agency. Second Am. Compl. ¶¶ 15-22. He now challenges those actions of the Agency alleging that he was denied the promotions for discriminatory and retaliatory reasons. Specifically, the plaintiff contends that several days after he initiated Porter I, he applied for a Supervisory Labor Relations Specialist position at the GS-15 grade level. Id. ¶ 15. And in 2001, while Porter I was still pending, the plaintiff also applied for an Administrative Officer position at the GS-15 grade level, id. ¶ 18, as well as a Deputy Chief position in the Personnel Operations Division at the GS-15 grade level, id. ¶ 21. In each case, the Agency did not select the plaintiff for the positions. Id. ¶¶ 15-22.

On August 24, 2004, the plaintiff instituted this action under Title VII alleging that, with respect to these non-selections, as well as other employment actions, the Agency engaged in discriminatory employment practices because of the plaintiff's race and gender, and retaliatory employment practices due to the plaintiff's participation in a protected activity, i.e., his 2001 lawsuit against the defendant and related EEO complaints. See Compl. ¶¶ 22-30; see also Second Am. Compl. ¶¶ 29-63. In addition, the plaintiff asserts the following claims arising from four additional incidents of alleged discrimination and retaliation: (1) the denial of a performance

bonus award for the work he performed in 2001, despite his overall rating of "Excellent,"[2] id. ¶ 24; (2) his supervisor's "Needs Improvement" evaluation in February 2003, with respect to his 2002 job performance, id. ¶ 25; (3) the mid-year "borderline unacceptable" oral assessment he received with respect to his 2003 job performance, id. ¶ 27; and (4) his receipt of an interim "Unacceptable" assessment in September 2004, with respect to his 2004 job performance, id. ¶ 28.

On July 21, 2006, the defendant filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 stating that there are no genuine issues of material facts in this case, and the defendant is entitled to judgment as a matter of law.  Def.'s Mot. at 1. Specifically, the defendant contends: (1) as to Counts I-VI of the second amended complaint,[3] which challenge the Agency's promotion decisions, each claim should be dismissed because the individuals selected were more qualified for the positions than was the plaintiff, Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem.") at 2; (2) Counts III, IV, VII, IX, and X should be dismissed because the plaintiff failed to exhaust his administrative remedies as to these claims, id. at 2, 4, 7-9, 22-24; (3) Counts VII-XIV, which challenge the Agency's "denial of a bonus award and certain performance appraisals," should be dismissed because they are "unmeritorious," and allege "nothing more

---

[2]     The ratings scale ranks performances from one through five, with one representing "Unacceptable," two representing "Need Improvement," three representing "Effective," four representing "Excellent," and five representing "Exceptional."  Second Am. Compl. ¶¶ 25, 28.

[3]     The defendant contends that Counts I-VII of the plaintiff's Second Amended Complaint pertain to the Agency's promotion decisions and the remaining claims, Counts VIII-XIV, pertain to the Agency's "alleged denial of a bonus award and certain performance appraisals."  Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem.") at 1-2.  It appears, however, that Count VII asserts a Title VII claim against the Agency for allegedly "denying [the plaintiff] a performance bonus award," Second Am. Compl. ¶ 45, and should be grouped with the latter category of claims, not the former.

than personality disputes, complaints about management style or the normal trials and tribulations of any workplace," id. at 2; and (4) Counts VII-XIV are barred by res judicata, id. at 3-4.

In response, the plaintiff contends that summary judgment is improper because: (1) as to each claim he has made out a prima facie case that the defendant's actions amounted to unlawful discrimination or retaliation based on his race or gender, or in response to his prior protected activity, and any non-discriminatory or non-retaliatory reasons offered by the Agency for its decisions not to select him are merely pretextual, Pl.'s Opp'n at 14, 16, 22, 26, 33, 54; (2) the existence of genuine issues of material fact regarding whether his performance rating was an adverse employment action precludes summary judgment, id. at 31; (3) the acts alleged in his Counts VII-XIV relate to events that occurred after the verdict in Porter I was rendered and therefore are not barred by res judicata as they "were not pled, litigated or adjudicated" in Porter I, id. at 14; and (4) he has exhausted his administrative remedies with respect to Counts III, IV, and X,[4] id. at 52, 68.

---

[4]      The plaintiff does not contest the defendant's motion for summary judgment as to Counts VII, IX, XI, and XIII, and the portion of Count V which alleges racial discrimination. Pl.'s Opp'n at 2. As the basis for why judgment is proper on these counts, the defendant argues that the plaintiff has failed to exhaust his administrative remedies as to these claims. Def.'s Mem. at 7-9, 22-24. Accordingly, the Court will dismiss these claims under Federal Rule of Civil Procedure 12(b)(6) as failing to state claims upon which relief can be granted. See Fox v. Am. Airlines, Inc., 389 F.3d 1291, 1294-95 (D.C. Cir. 2004) (holding that the district court did not abuse its discretion by applying a "straightforward" application of Local Rule 7(b) in granting as conceded the defendant's motion to dismiss when the plaintiffs failed to oppose it); Bancoult v. McNamara, 227 F. Supp. 2d 144, 149 (D.D.C. 2002) ("[I]f the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded, even when the result is dismissal of the entire case.").

## II.  STANDARD OF REVIEW

To grant a motion for summary judgment under Rule 56(c), this Court must find that "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party.  Bayer v. U.S. Dep't of Treasury, 956 F.2d 330, 333 (D.C. Cir.1992).  However, the non-moving party cannot rely on "'mere allegations or denials . . . , but . . . must set forth specific facts showing that there [are] genuine issue[s] for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citation omitted) (some alterations in original).  Under Rule 56(c), if a party fails to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is warranted.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  However, the party moving for summary judgment bears the burden of establishing the absence of evidence that supports the non-moving party's case.  Id. at 325.

## III.  LEGAL ANALYSIS

### A.     Exhaustion of Administrative Remedies

A plaintiff who fails to exhaust the administrative remedies available to him in pursing a claim of discrimination or retaliation, and who is not otherwise excused from doing so, may not seek relief from a United States district court on those claims under Title VII.  Brown v. Gen. Servs. Admin., 425 U.S. 820, 832-33 (1976); Jarrell v. U.S. Postal Serv., 753 F.2d 1088, 1091 (D.C. Cir. 1985) ("a timely administrative charge is a prerequisite to initiation of a Title VII action in the District Court . . . [']subject to waiver, estoppel, and equitable tolling.'" (quoting

Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982))); see also 42 U.S.C. § 2000e-5(e)-(f) (setting forth the time limitations for filing charges with the Equal Employment Opportunity Commission or a United States district court); 29 C.F.R. § 1614.105(a)(1) (1992) ("An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.").  The defendant contends that the plaintiff did not exhaust his remedies with respect Counts III, IV, and X.[5]  Def.'s Mem. at 7, 22-23.  The plaintiff counters that he has exhausted his administrative remedies, and all of his claims are therefore properly before the Court.  Pl.'s Opp'n at 52, 68.

As to Counts III and IV, which relate to the plaintiff's claims concerning the Agency's selection of an Administrative Officer in its Global Bureau in May 2001, the defendant maintains that the plaintiff "first contacted the [A]gency concerning the Global Position selection on June 13, 2001," a date which exceeded the forty-five day window within which he had to file a timely administrative complaint.  Def.'s Mem. at 9.  In support of its argument, the defendant contends that the forty-five day period commenced on April 25, 2001.  Id.  The plaintiff's second amended complaint, however, states that the alleged discrimination asserted in Counts III and IV occurred in "May 2001," Second Am. Compl. ¶ 18, and the plaintiff's statement of undisputed material facts clarifies that it was specifically on May 28, 2001, when the Agency selected another candidate for the Administrative Officer position, Plaintiff's Rule 7.1(h) Statement in Response

---

[5]    Based on the plaintiff's concession to the grant of summary judgment on Counts VII, IX, XI, and XIII, as well as the portion of Count V, which alleges racial discrimination, note 4, supra, the Court will not address the defendant's arguments regarding the plaintiff's alleged failure to exhaust his administrative remedies with respect to any of these Counts.

to Defendant's Statement of Undisputed Material Facts ("Pl.'s Facts Statement") ¶ 186.  Thus, the

plaintiff contends that his administrative claim was filed timely.

The question, therefore, is whether April 25, 2001, or May 28, 2001, was the date when

the 45-day time period began to run.  The plaintiff argues that although the Administrative

Officer position at issue was classified as GS-15 on April 25, 2001, Pl.'s Facts Statement ¶ 185, it

was the awarding of that position to another candidate, and thus the denial of the position to the

plaintiff on May 28, 2001, that amounted to discrimination and retaliation about which he is

complaining, Second Am. Compl. ¶¶ 35, 38.  Because the Court must consider the facts in the

light most favorable to the plaintiff, and the plaintiff contends that May 28, 2001, is the operative

date when the forty-five day time period commenced, the Court finds that the plaintiff's June 13,

2001 administrative complaint was filed within the required time frame, and that the plaintiff has

therefore exhausted his administrative remedies with respect to Counts III and IV.

As to Count X, which concerns the plaintiff's challenge to his 2002 "Needs

Improvement" performance assessment, the defendant contends that while the plaintiff initially

suspected that he was the subject of retaliation in early 2002, he did not file an administrative

complaint until October 4, 2002.  Def.'s Mem. at 23.  The plaintiff seemingly contends that "[o]n

February 21, 2003, the Agency discriminated against [him]" when it provided him with the 2002

"Needs Improvement" performance evaluation.  Second Am. Compl. ¶ 25.  This evaluation was

rendered after the plaintiff filed his November 2002 EEO complaint against the Agency based on

his supervisor's refusal to award him a bonus.  Pl.'s Facts Statement ¶ 70.  Therefore, while that

EEO complaint did not contest his 2002 "Needs Improvement" performance rating, Pl.'s Facts

Statement, Exhibit ("Ex.") 32 (Individual Complaint Form for Employment Discrimination) at 2,

the plaintiff maintains that "in early March 2003, [he] contacted an EEO counselor regarding [his] claim [concerning his 2002 'Needs Improvement' performance rating]" and sought to amend the November 2002 complaint to include that allegation, Pl.'s Opp'n at 52; Pl.'s Facts Statement, Ex. 49 (E-mail from Melvin Porter to David Grim (Mar. 10, 2003)).  Specifically, the plaintiff states that "[o]n March 10, 2003, [he] e-mailed an EEO Counselor, asking that his challenge to the 2002 Needs Improvement Assessment be added to his challenge of the bonus denial, which had been pending since October 2002 [sic]."  Pl.'s Opp'n at 52.  In addition, the plaintiff maintains that the questionnaire provided to the plaintiff's supervisor regarding the plaintiff's November 22, 2002 administrative complaint included questions concerning his 2002 Needs Improvement Assessment.  Pl.'s Facts Statement, Ex. 50 (Affidavit of Barbara Turner) at 1. Therefore, in reading the facts in the light most favorable to the plaintiff, the Court must find that the plaintiff has not failed to exhaust his remedies with respect to his 2002 Needs Improvement assessment, as alleged in Count X of his second amended complaint, because he constructively amended his November 2002 EEO complaint to include a claim with respect to the 2002 assessment.[6]

---

[6]     In addition, based on the Agency's investigation of the plaintiff's complaints, Pl.'s Facts Statement, Ex. 50 (Affidavit of Barbara Turner) at 1, and in the absence of any evidence in the record that, in response to the plaintiff's seeking to amend his November 2002 EEO complaint with the new information, the Agency rejected the plaintiff's amendment or informed him that the would need to file a new complaint, see Pl.'s Opp'n at 52; Pl.'s Facts Statement, Ex. 49 (E-mail from Melvin Porter to David Grim (Mar. 10, 2003)), the Court cannot find that the Agency can now credibly argue that the plaintiff's failure to file a formal administrative complaint precludes him from litigating these matters.  See Brown v. Marsh, 777 F.2d 8, 16 (D.C. Cir. 1985) (finding the doctrine of equitable estoppel prevented the defendant from arguing that the plaintiff's "failure to timely consult an EEO counselor" barred the plaintiff's Title VII suit because "[t]he Army . . . led [the plaintiff] to believe that it was considering and investigating his complaints from the outset of this matter").

**B.**     <u>**Res Judicata**</u>

"<u>Res judicata</u> bars a claim when there has been a final judgment on the merits in a prior

suit involving the same parties or their privies and the same cause of action."  <u>Polsby v.</u>

<u>Thompson</u>, 201 F. Supp. 2d 45, 48 (D.D.C. 2002) (citing <u>I.A.M. Nat'l Pension Fund v. Indus.</u>

<u>Gear Mfg. Co.</u>, 723 F.2d 944, 946-47 (D.C. Cir. 1983)).   The doctrine precludes relitigation of

claims that are identical to the claims that were raised and addressed previously or could have

been raised in the earlier lawsuit, as well as "'issue[s] of fact or law [which were] actually

litigated and resolved in a valid court determination essential to the prior judgment,' even if the

issue recurs in the context of a different claim."  <u>Taylor v. Sturgell</u>, __ U.S. __, __, 128 S. Ct.

2161, 2171 (2008) (quoting <u>New Hampshire v. Maine</u>, 532 U.S. 742 (2001)).  "By 'preclud[ing]

parties from contesting matters that they have had a full and fair opportunity to litigate,' [the

doctrines of issue and claim preclusion] protect against 'the expense and vexation attending

multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by

minimizing the possibility of inconsistent decisions.'"  <u>Id.</u> (quoting <u>Montana v. United States</u>,

440 U.S. 147, 153-54 (1979)) (some alterations in original).

"The four factors that must exist for <u>res judicata</u> to apply are (1) an identity of parties in

both suits; (2) a judgment rendered by a court of competent jurisdiction; (3) a final judgment on

the merits; and (4) the same cause of action in both suits."  <u>Polsby</u>, 201 F. Supp. 2d at 48 (citing,

among others, <u>U.S. Indus., Inc. v. Blake Constr. Co.</u>, 765 F.2d 195, 205 n. 21 (D.C. Cir. 1985)).

"[T]he doctrine of <u>res judicata</u> applies to all the parties' rights regarding matters that could have

been litigated as well as those matters that were actually litigated."  <u>Id.</u> at 48 (citing <u>I.A.M. Nat'l</u>

<u>Pension Fund</u>, 723 F.2d at 947).

The defendant contends that it is entitled to judgment as a matter of law on Counts VIII, X, XII, and XIV of the plaintiff's second amended complaint (i.e. the plaintiff's retaliation claims with respect to his 2001 bonus, his 2002 year-end performance assessment, his 2003 mid-year performance assessment, and his 2004 interim performance assessment) because the allegations contained within these Counts were litigated in Porter I.[7]   Def.'s Mem. at 21-22.  The defendant maintains that the member of this Court who presided over Porter I rendered a final judgment on those matters in post-judgment proceedings.  Id.  The plaintiff responds that Porter I "did not encompass any of the claims asserted in this case," and because the allegations of retaliation that he makes here "were not pled, litigated, or adjudicated by judge or jury in the earlier case," res judicata does not bar him from bringing them in this action.  Pl.'s Opp'n at 15.  The Court agrees with the defendant as to Counts VIII and X, but disagrees that res judicata bars Counts XII and XIV.

Two preliminary matters are beyond dispute: the parties in this lawsuit are identical to those in Porter I, and this Court, a court of competent jurisdiction, presided in that litigation, which was resolved by a final judgment on the merits.  See, e.g., Porter I, 293 F. Supp. 2d 152, 158 (D.D.C. 2003) (awarding attorneys' fees).  Therefore, the only issue that remains as to whether the claims being challenged on res judicata grounds are barred from consideration in this

---

[7]       The Court takes judicial notice of the court record in Porter I, as well as those excerpts extracted from the parties' filings in that case.  See Fed. R. Evid. 201(b)-(c) ("A court may take judicial notice, whether requested or not" of any fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); see, e.g., Coleman v. Burnett, 477 F.2d 1187, 1198 (D.C. Cir. 1973) (wherein the Circuit Court "[e]xercis[ed] [its] power to judicially notice proceedings in related cases").

case is whether the claims that the plaintiff now advances were among those claims on which the Court in Porter I rendered a final judgment upon the merits.

Without running afoul of the doctrine of res judicata, there is no question that the plaintiff may advance any retaliation claims which arose from events subsequent to the Court's judgment in Porter I, so long as those claims were not covered by the factual allegations upon which the judgment was based. See Joshi v. Prof'l Health Servs., Inc., 817 F.2d 877, 880-81 (D.C. Cir. 1987). But that is not what the plaintiff attempts to do here. Rather, the plaintiff now contends that the Agency committed acts of discrimination and retaliation against him during the pendency of Porter I, which include the same acts which served as the basis for the plaintiff's post-judgment motion in Porter I alleging that the Agency violated the Court's order enjoining it from further retaliation against the plaintiff. Pl.'s Show Cause Mem. at 1-2, Porter I (D.D.C. June 24, 2003). In those post-judgment proceedings the parties briefed for the Court and litigated whether the Agency's acts of (1) denying the plaintiff a 2001 bonus and (2) providing him with a 2002 "Needs Improvement" assessment constituted retaliation. Compare id. at 2, with Second Am. Compl. ¶¶ 44-53. The question therefore becomes whether the Court's post-judgment orders amounted to a final judgment on these issues.

Part of the relief that the plaintiff sought in Porter I included injunctive relief forbidding the Agency from retaliating against him. Judgment at 2, Porter I (D.D.C. Feb. 3, 2003); Memorandum at 1-2, Porter I (D.D.C. Feb. 3, 2003). The Court awarded the plaintiff this relief following a favorable jury verdict on two counts of his complaint. Judgment at 2, Porter I (D.D.C. Feb. 3, 2003). Seeking to enforce this injunctive relief, the plaintiff fully briefed and offered documentary evidence to support his allegations that the Agency retaliated against him

13

when it denied him a 2001 performance bonus and gave him a "Needs Improvement"

performance rating for 2002.  Pl.'s Show Cause Mem. at 1-2, <u>Porter I</u> (D.D.C. June 24, 2003).

The Agency opposed the motion and offered voluminous evidentiary support of its own position.

<u>See</u> Defendant's Response to Order to Show Cause at 1, <u>Porter I</u> (D.D.C. Sept. 5, 2003).  Upon

considering both parties' evidence, the Court discharged the plaintiff's show cause motion on the

grounds that his allegations did not meet the legal standard necessary to establish a retaliation

claim.  Memorandum & Order ¶¶ 1-2, <u>Porter I</u> (D.D.C. Nov. 25, 2003); <u>see also</u> Order at 1-2,

<u>Porter I</u> (D.D.C. May 25, 2005).  The Court also denied the plaintiff's request to conduct

additional discovery concerning the alleged retaliation.  <u>Id.</u>  Specifically, that member of this

Court stated:

> I find no evidence of contempt in the record before me.  [The
> plaintiff] was not entitled to a performance award for 2001 when
> only 35% of those eligible were given such awards (and when 17
> of 25 employees who had received "excellent" performance ratings
> did not receive awards).  Nor was he entitled to an "excellent"
> performance rating in 2002, from a new supervisor, working in a
> changed organization, especially when he "actively and
> deliberately avoided supervisory feedback."

Memorandum & Order ¶ 2, <u>Porter I</u> (D.D.C. Nov. 25, 2003).  In a second order, which addressed

the plaintiff's request for permission to conduct discovery regarding the alleged retaliation, the

same member of this Court reiterated:

> The most startling assertion of the motion – that "Barbara Turner
> has brazenly approached Agency employees in an attempt to
> obtain information that Ms. Turner could – as described in her own
> words – 'use against' Mr. Porter," . . . turns out to be supported
> only by Mr. Porter's declaration about something said to him about
> something Ms. Turner allegedly said nearly two years ago. What
> Mr. Porter calls "fresh evidence of the Agency's retaliatory
> motivations and actions," . . . is also uncorroborated hearsay . . .
> The injunction [prohibiting the Agency from retaliating against the
> plaintiff] does not make [the plaintiff's] position a sinecure, or

> guarantee that he will receive superior performance evaluations or
> promotions, or forbid anyone to say anything negative about him.

Order at 1-2, Porter I (D.D.C. May 25, 2005).

Therefore, after having reviewed the record and the docket entries of the previous lawsuit brought by this plaintiff, this Court is convinced that the plaintiff received the equivalent of a final judgment on the merits of his retaliation claims concerning the 2001 bonus and his 2002 performance review.  The record in Porter I reflects that the parties fully briefed and provided evidentiary support on the issue of whether those acts constituted retaliation, and a member of this Court weighed the factual evidence proffered and rendered a judgment on the merits of those matters.  The plaintiff having been afforded the opportunity to litigate his retaliations claims as to the 2001 bonus and 2002 performance evaluation on the merits in his 2000 lawsuit against the defendant, and having received the equivalent of a final judgment on the merits rendered by a court of competent jurisdiction on these same claims he seeks to pursue in this case, the Court finds that Counts VIII and X are barred by the doctrine of res judicata.[8]  However, because the plaintiff has not yet had the opportunity to pursue his claims of retaliation as to the later performance assessments – his 2003 mid-year performance assessment as alleged in Count XII, and his 2004 interim performance assessment as alleged in Count XIV – the Court cannot find that those claims are barred by res judicata.

---

[8]     The plaintiff had his one bite of the apple as to these claims.  The plaintiff's only avenue for relief as to the Court's discharge of his show cause motion was to appeal, just as the plaintiff appealed other post-judgment orders in his earlier case.  See Notice of Appeal, Porter I (D.D.C. Feb. 10, 2004).  The plaintiff does not get to re-assert his claims in a second lawsuit simply because he disagrees with the Court's finding that those acts did not amount to retaliation.

**C.     Discrimination Based on Race and Gender**

Title VII provides that "personnel actions affecting employees . . . in executive agencies . . . shall be made free from any discrimination based on race . . . [or] sex."  42 U.S.C. § 2000e-16(a).  It also provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

Title VII is not absolute, however.  The Supreme Court has stated:

> Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications.  In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group.  Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed.

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800 (1973) (quoting Griggs v. Duke Power Co., 401 U.S. 424, 430-31 (1971)); see Valentino v. U.S. Postal Serv., 674 F.2d 56, 66-67 (D.C. Cir. 1982) (applying this rationale to claims of discriminatory refusal to promote under Title VII).  Similarly, the District of Columbia Circuit has repeatedly stated that Title VII does not, and was not intended, to transform a court into "a super-personnel department that reexamines an entity's business decisions."  Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006) (internal quotation marks and citations omitted).  Indeed, "Title VII liability cannot rest solely upon a judge's determination that an employer [has] misjudged the relative qualifications of admittedly qualified candidates."  Fischbach v. D.C. Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir.

1996) (citation omitted).  And, "[s]hort of finding that the employer's stated reason [for its selection decision] was [merely] a pretext [for unlawful discrimination,] . . . the [C]ourt must respect the employer's unfettered discretion to choose among qualified candidates."  Id. (citations omitted).  In this regard, "[t]he ultimate burden of persuading the trier of fact that the [employer] intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (internal quotation marks and citation omitted).

Where, as here, the plaintiff has not proffered any direct evidence of intentional discrimination, his Title VII race and gender discrimination claims under Title VII are evaluated under the burden-shifting framework first articulated in McDonnell Douglas.[9]  411 U.S. at 802; see also Porter v. Natsios, 414 F.3d 13, 17-18 (D.C. Cir. 2005).  Under this framework, the plaintiff bears the initial burden of "establishing a prima facie case of . . . discrimination" by a preponderance of the evidence.  McDonnell Douglas, 411 U.S. at 802.  To do so, the Supreme Court stated that the plaintiff must show

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

---

[9]     "Direct evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in question without any need for inference. Such evidence includes any statement or written document showing a discriminatory motive on its face." Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 86 (D.D.C. 2006) (Walton, J.) (internal quotation marks, citations, and alterations omitted) (emphases in original). The plaintiff does not argue, nor could he, that the factual record in this case contains any such direct evidence of discrimination.

Id.  However, where the plaintiff, as here, claims that his federal employer failed to promote him,

the McDonnell Douglas test has been modified to require that

> to make out a prima facie case the plaintiff must show that [he]
> belongs to a protected group, that [he] was qualified for and
> applied for a promotion, that [he] was considered for and denied
> the promotion, and that other employees of similar qualifications
> who were not members of the protected group were indeed
> promoted at the time the plaintiff's request for promotion was
> denied.

Bundy v. Jackson, 641 F.2d 934, 951 (D.C. Cir. 1981) (citation omitted).

"If the plaintiff establishes a prima facie case of discrimination, the burden shifts to the

defendant employer to produce evidence that the plaintiff was rejected, or someone else was

preferred, for a legitimate, nondiscriminatory reason." Jackson v. Gonzales, 496 F.3d 703, 707

(D.C. Cir. 2007) (quoting Reeves, 530 U.S. at 142 (internal quotation marks omitted)).  Once

"the employer offers a non-discriminatory justification for its actions, the McDonnell Douglas

framework falls away," Vickers v. Powell, 493 F.3d 186, 195 (D.C. Cir. 2007), and the burden

shifts back to the plaintiff to show that the employer's proffered reason is merely "pretextual,"

and designed to "shield[] discriminatory motives," Jackson, 496 F.3d at 707 (citing Murray v.

Gilmore, 406 F.3d 708, 713 (D.C. Cir. 2005)).

When making promotions decisions, an "employer has discretion to choose among

equally qualified candidates, provided the decision is not based upon unlawful criteria." Tex.

Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 259 (1981).  Thus, "[i]n order to justify an

inference of discrimination, the qualifications gap [between the candidates] must be great enough

to be inherently indicative of discrimination," i.e., there must be "a 'wide and inexplicable gulf'

between candidates." Holcomb, 433 F.3d at 897 (quoting Lathram v. Snow, 336 F.3d 1085, 1091

(D.C. Cir. 2003)).  So, when the qualifications are close, the Court must give the Agency the benefit of the doubt as to its choice among similarly qualified candidates.  Id. ("'In a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call.'") (quoting Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc)).

Here, the plaintiff, an African-American male, alleges that the defendant committed three acts of discrimination: (1) "by denying him a promotion on the basis of his race to the position of GS-15 Supervisory Labor Relations Specialist," Second Am. Compl. ¶ 30 (Count I); (2) "by denying him a promotion on the basis of his race to the position of GS-15 Administrative Officer within the Agency's Global Bureau," id. ¶ 35 (Count III); and (3) "by denying him a promotion on the basis of his gender . . . to the position of GS-15 Deputy Chief within the Agency's Personnel Operations Division," id. ¶ 40 (Count V, as amended by the plaintiff's consent to partial summary judgment, see Pl.'s Opp'n at 2).  The Court will address each non-selection in turn.

### 1.    The Supervisory Labor Relations Specialist Position

In Count I of his second amended complaint, the plaintiff alleges several days after he initiated Porter I, he applied for a GS-15 grade level Supervisory Labor Relations Specialist position.  Second Am. Compl. ¶ 15.  The plaintiff was not interviewed for the position, and he maintains that the Agency discriminated against him when it filled the position with another candidate, a Caucasian male, who the plaintiff alleges was not as qualified as he was for the position.  Id. ¶¶ 16-17.  The plaintiff maintains that when the selection decision was made he had

more "management experience," "extensive supervisory training," and more experience working within the Agency than did the successful candidate.  Id. ¶ 17.

The defendant contends that the plaintiff cannot maintain a Title VII discrimination claim as to the Supervisory Labor Relations Specialist position because he cannot demonstrate that he was better qualified for the position that required "[k]nowledge of the laws, regulations, theories, principles, practices, and techniques of employee and labor relations," "discussions and negotiations with unions," and "represent[ation of] the Agency in negotiations and before administrative tribunals and to draft legal documents," skills possessed by the attorney who was ultimately selected.  Def.'s Mem. at 14-15 (internal quotation marks omitted); see also Pl.'s Facts Statement, Ex. 61 (U.S. Agency for International Development Vacancy Announcement ("Supervisory Labor Relations Specialist Vacancy Announcement")) at 1.  The defendant therefore maintains that the successful candidate was "significantly better qualified than [the plaintiff]" because the plaintiff, while experienced within the Agency and possessing supervisory experience, "was involved with negotiating only one contract or agreement during his career," "wrote only one appeal, . . . ha[d] never written a final agency decision during his career" or "an agency-level Foreign Service decision," and had never "appeared before the Foreign Service Grievance Board," all which were relevant qualifications for the position and expected tasks of the person selected for the position.  Def.'s Mem. at 15-16.

As to his claim of racial discrimination related to the Supervisory Labor Relations Specialist position, the plaintiff has established "that [he] belongs to a protected group, [a racial minority,] that [he] . . . applied for a promotion, . . . and that [another] employee[] of similar qualifications who w[as] not [a] member[] of the protected group w[as] indeed promoted at the

time the plaintiff's request for promotion was denied." <u>Bundy</u>, 641 F.2d at 951 (citation

omitted).  The remaining factors that the plaintiff must also establish to make out a <u>prima facie</u>

case are "that []he was qualified for . . . [and] considered for . . . the promotion." <u>Id.</u>

It is questionable whether the plaintiff has shown that he was qualified for the position.

While the plaintiff has an extensive professional background, including supervisory experience

and educational training in business administration, Pl.'s Facts Statement, Ex. 2 (Resume of

Melvin C. Porter), which are some of the qualifications that the Agency desired for the

Supervisory Labor Relations Specialist position, and while the position did not require that the

candidate have a law degree, Pl.'s Facts Statement, Ex. 61 (Supervisory Labor Relations

Specialist Vacancy Announcement), many of the job functions of the position identified in the

vacancy announcement involve law related tasks, skills which the plaintiff had little or no

experience performing, <u>id.</u>  However, despite the fact that the job description sought a candidate

with some skills the plaintiff did not possess, the Court is sensitive to the minimal threshold a

plaintiff must satisfy to establish a <u>prima facie</u> case of discrimination, and will therefore assume

that the plaintiff has met that threshold.  <u>Burdine</u>, 450 U.S. at 253 ("The burden of establishing a

prima facie case of disparate treatment is not onerous.").

The plaintiff having established his <u>prima facie</u> case, the Court must consider next the

Agency's proffered reason why it hired a Caucasian candidate rather than the plaintiff.  The

Agency asserts that it made its selection because the selectee was an attorney who "had practiced

law for approximately ten years prior to his selection for the [position]," held a law degree from

a prestigious law school, Def.'s Mem. at 15, and had experience performing legally related

functions required of the position, <u>see</u> Pl.'s Facts Statement, Ex. 61 (Supervisory Labor Relations

Specialist Vacancy Announcement).  As to why the Agency did not select the plaintiff, it asserts that the plaintiff did not have a legal degree, had drafted only one appeal, never prepared a final agency decision during his career or wrote an agency-level Foreign Service decision, and had never represented the Agency before the Foreign Service Grievance Board, all tasks which he would be required to do if he had been selected for the position.  Def.'s Mem. at 15-16.  In short, the Agency represents that it hired the other candidate because he had more experience doing the type of work called for by the position.  Id.  The Court finds this explanation qualifies as a lawful, nondiscriminatory rationale for the Agency's decision not to select the plaintiff.

The burden therefore shifts back to the plaintiff to demonstrate that the Agency's rationale for its decision was a mere pretext, concealing a true discriminatory motive, Jackson, 496 F.3d at 707, which the plaintiff has not satisfied.  In his attempt to meet this burden, the plaintiff contends that the vacancy announcement was drafted in a manner that deliberately "disadvantage[d]" him, because before it was revised, a previous version of the announcement had a greater focus on supervisory skill,[10] and the Agency "selected a candidate with little to no supervisory experience for a supervisory position."  Pl.'s Opp'n at 54.  The evidence in the record simply does not demonstrate that the plaintiff's experience rendered him better qualified than the candidate hired by the Agency, or that the Agency's vacancy announcement for the position misrepresented the skills actually required of the position.  The position required that the selectee

---

[10]     The plaintiff makes a great deal about the title of the position, including the descriptive term "Supervisory," which in the plaintiff's view indicates greater need for supervisory skills over other skills.  Pl.'s Opp'n at 56.  But, as the description for the position explains, the Agency was also looking for more than just a supervisor in filling the position, see Pl.'s Facts Statement, Ex. 61 (Supervisory Labor Relations Specialist Vacancy Announcement), as it was looking for someone to manage labor relations; the same rationale it gave for selecting the candidate it choose.  Def.'s Mem. at 15-16.  The Court therefore cannot find that the position's title was determinative of the type of skills that the Agency needed and gives rise to an inference of impropriety as the plaintiff urges.

possess the "[a]bility to effectively communicate orally and interact with coworkers," "effectively communicate in writing," "effectively meet and deal with others," "[have] [k]nowledge of the laws, regulations, theories, principles, practices, and techniques of employee and labor relations," and "negotiate within the collective bargaining process." Def.'s Mem., Ex. 6 (Supervisory Labor Relations Specialist Vacancy Notice) at 2; see also Def.'s Mem., Ex. 29 (Supervisory Recertification).  These skills were required because the selectee would serve as an advisor in regards to the Agency's labor management obligation, "[c]onduct[] discussions and negotiations with unions representing Agency employees and prepare[] agreements, . . . [r]epresent[] the Agency before the Federal Labor Relations Authority [and] the Foreign Service Labor Relations Board, . . . [and] [r]ender final Agency decisions." Def.'s Mem., Ex. 6 (Supervisory Labor Relations Specialist Vacancy Notice) at 1; see also Def.'s Mem., Ex. 29 (Supervisory Recertification).  It is no wonder then that the Agency hired someone with more labor relations and legal experience than the plaintiff, who is not an attorney and had little to no experience in these areas.  See Pl.'s Opp'n at 59.  In essence, there was no "'wide and inexplicable gulf' between [the] candidates" favoring the plaintiff.  See Holcomb, 433 F.3d at 897 (citation omitted).  The Court therefore has no basis to infer that the Agency's reasoning for the plaintiff's non-selection was a pretext for an improper discriminatory motive.

The plaintiff also argues that the Agency's selecting official, Marilyn Marton, "exercised her unlawful animus towards" him through his non-selection. Pl.'s Opp'n at 54-55.  Yet, the plaintiff offers no evidence from which the Court can find that his claim can survive summary judgment on that basis.  Specifically, the plaintiff has not shown how it can be inferred that his race played any role in the Agency's decision.  Simply, the plaintiff has shown nothing more than

when the Agency made its selection for the Supervisory Labor Relations position that it

exercised its "discretion to choose among [presumably] equally qualified candidates," which it is

lawfully permitted to do.  Burdine, 450 U.S. at 259.  Therefore, having failed to meet his burden

of demonstrating that the Agency's selection of another candidate for the Supervisory Labor

Relations Specialist position was discriminatory based on his race, the Court will award

summary judgment to the Agency on Count I of the plaintiff's second amended complaint.

>        **2.        The Administrative Officer Position**

In Count III of his second amended complaint, the plaintiff alleges that in 2001, while

Porter I was still pending, the Agency laterally transferred a Caucasian into the role of a GS-15

grade level Administrative Officer, a position for which the plaintiff alleges that he was more

qualified.  Second Am. Compl. ¶¶ 18-20.  The Agency did not open the position to competition,

id. ¶ 19, and the plaintiff contends that because he never "ha[d] [the] opportunity to express his

interest in [that] position" or compete for it, although he was qualified, that the lateral transfer

was "illicit" and amounted to racial discrimination against him.  Pl.'s Opp'n at 63.

The Agency maintains that it made the transfer because the individual who was

reassigned was "'absolutely outstanding'" based on "'the quality of his thinking, how articulate he

was, how broad based [he was] in his thinking, . . . [as a] teacher and mentor . . . to the staff,'"

and he had a "long and distinguished career in the personnel field," including his publications

and "college-level teaching experience," qualifications which the plaintiff did not possess.  Def.'s

Mem. at 13-14 (citation omitted).

As to proving his prima facie claim of racial discrimination with respect to the

Administrative Officer position, the plaintiff has established that he is a member of a racial

minority, a protected group, who desired a job that the Agency filled through the lateral transfer

of another individual without utilizing the competitive process, which would have allowed him

to compete for the position.  While there is a question whether this position amounted to a

"promotion" for the candidate selected for the position, see Bundy, 641 F.2d at 951 (requiring

that the plaintiff show "that other employees of similar qualifications who were not members of

the protected group were indeed promoted at the time the plaintiff's request for promotion was

denied" (emphasis added) (citation omitted)), the Court will presume that the plaintiff has

shouldered his burden of establishing a prima facie case of racial discrimination as to the

Administrative Officer position.  See McDonnell Douglas, 411 U.S. at 802.

The Court must next examine the Agency's proffered rationale for why it made the

selection decision it did.  As noted, the Agency maintains that its transfer decision was based on

the selectee's "'absolutely outstanding'" credentials, including a "long and distinguished career in

the personnel field," his publications, and "college-level teaching experience."  Def.'s Mem. at

13-14.  The Agency also points to the fact that the transferee was already a grade level higher

than the plaintiff when the transfer into the Administrative Officer position was made, making it

a lateral transfer.  Id. at 13.  In essence, the Agency argues that no one was denied a promotion.

The Court finds that the Agency's explanation amounts to a legitimate, non-discriminatory

rationale for its decision.

In response, the plaintiff represents he was better qualified for the position than the

transferred candidate based on his "six (6) years of experience as an Administrative Officer at the

GS-14 grade level," Second Am. Compl. ¶ 20, and "the GS-15 Administrative Officer position

was a natural progression for a veteran GS-14 Administrative Officer such as [he was]," Pl.'s

Opp'n at 65.  These unsupported self-serving allegations alone are insufficient to carry the

plaintiff's burden of showing that the Agency's decision was a pretext for racial discrimination.

The transferred candidate had served at GS-15 grade level for longer than the plaintiff had even

been assigned to the Global Bureau.  Def.'s Mem. at 13 (citing Second Am. Compl. ¶ 20).  The

plaintiff's greater experience serving as an Administrative Officer at a lower grade level than the

transferred candidate is inadequate to demonstrate that the Agency concealed its true motive of

making its decision not to open the position up to a competitive selection process based on the

racial animus against him.  The Agency was permitted to laterally transfer an employee pursuant

to its internal policy[11] and the plaintiff has failed to produce any evidence to disturb the apparent

propriety of that decision.

 Accordingly, because the plaintiff has not rebutted the Agency's proffered legitimate,

non-discriminatory reason for its decision based on the evidence in the record, the Court must

award summary judgment to the defendant on Count III of the amended complaint.

---

[11] The Agency policy is called the Automated Directives System ("ADS").  Def.'s Mem. at 10 n.3. In 2001, the ADS provided in pertinent part:

> Competition under the Merit Promotion procedures is not required for the following actions:
>
>    . . .
>
> g) Promotion, reassignment, demotion, transfer, reinstatement, or detail to a position having promotion potential no greater than the potential of a position an employee currently holds or previously held on a permanent basis in the competitive service (or in another merit system with which OPM has an approved interchange agreement and which the employee did not lose because of performance or conduct reasons . . . .

Def.'s Mem., Ex. 19 (ADS § 418.5.8(g) (2001)).

3.        **The Deputy Chief Position**

In the remaining portion of the plaintiff's second amended complaint, which addresses a

position for which the plaintiff was not selected (Count V),[12] he alleges that in 2001, while

Porter I was still pending, he was an unsuccessful candidate for a GS-15 grade level Deputy

Chief position in the Personnel Operations Division.  Second Am. Compl. ¶ 21.  Here, the

plaintiff contends that he was not selected because the Agency discriminated against him based

on his gender and chose an allegedly unqualified African-American female instead.  Id.  The

plaintiff alleges that not only was he more qualified than the selectee, but that the individual

selected did not possess the minimum qualifications for the position, i.e., a bachelor's degree.

Pl.'s Opp'n at 61.  He alleges that his supervisor, who did not select him earlier for the

Supervisory Labor Relations Specialist position and had demonstrated "unlawful animus" against

him, id. at 55, "influenced" the selection decision for the Deputy Chief position, id. at 60.

The Agency contends that the plaintiff cannot maintain a Title VII discrimination claim

as to the Deputy Chief position because the candidate hired was better qualified due to her

"knowledge, skills, . . . abilities," and "leadership abilities."  Def.'s Mem. at 17-19.  The Agency

maintains that the candidate who was selected for the position had "over 34 years of experience

in human resource management," had been "acting in a position very similar to the [Deputy

Chief] position at issue," supervised three-to-four times the number of employees that the

plaintiff supervised at any given time, was the plaintiff's supervisor for up to two years, and

"'demonstrated broader knowledge in both civil service and foreign service personnel operations

and related rules, regulations and procedures which is critical to the functioning of the position'"

---

[12]        As the Court has already noted, the plaintiff does not contest the defendant's motion for summary
judgment as it relates to the portion of Count V, which alleges racial discrimination.  Pl.'s Opp'n at 2.

than did the plaintiff during the interviews for the position.  Id. at 18-19 (citation omitted).  The Agency further contends that because "[it] applied the same standards to each applicant, using the same interview panel and questions," it was "unlikely" than any discrimination occurred.  Id. at 19.

As to this gender discrimination claim, the plaintiff again has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination.  Concerning this burden, the plaintiff has established that he applied for a promotion for which he was not selected.  Pl.'s Opp'n at 60.  Yet, in this case, more is required.  Where a male plaintiff claims gender discrimination, the traditional McDonnell Douglas test is applied differently because "'there is nothing inherently suspicious'" about an employer's decision to promote a qualified minority applicant, in this case, a woman.  Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 851 (D.C. Cir. 2006) (quoting Harding v. Gray, 9 F.3d 150, 153 (D.C. Cir. 1993)); see also Hamilton v. Paulson, 542 F. Supp. 2d 37, 43 n.6 (D.D.C. 2008) (stating that "reverse discrimination" analysis applies where a male claims a violation of Title VII's protection against gender discrimination).  Thus, "a majority-group plaintiff alleging Title VII discrimination must show 'additional background circumstances that support the suspicion that the defendant is that unusual employer who discriminates against the majority.'"  Mastro, 447 F.3d at 851 (quoting Parker v. Balt. & Ohio R.R., 652 F.2d 1012, 1017 (D.C. Cir. 1981)); see also Hunter v. Rice, 480 F. Supp. 2d 125, 135 (D.D.C. 2007) (applying reverse discrimination analysis of Mastro where male alleged gender discrimination based on agency's promotion of female); cf. Nevada Dep't of Human Res. v. Hibbs, 538 U.S. 721, 730 (2003) ("'[I]t can hardly be doubted that . . . women still face pervasive, although at times more subtle, discrimination . . . in the job market.'"

(quoting <u>Frontiero v. Richardson</u>, 411 U.S. 677, 686 (1973))).  The plaintiff simply has offered

no evidence that the Agency is the type of employer who traditionally discriminates against men.

And, even assuming the plaintiff could meet his burden to establish institutional male

discrimination, <u>i.e.</u> his burden of proving a <u>prima facie</u> case, he also has not put forth enough

evidence to rebut the Agency's proffered legitimate, nondiscriminatory rationale for selecting the

candidate who was chosen for the position.  And here, the Agency has articulated a legitimate,

non-discriminatory explanation for its decision, having stated that the female selected had "over

34 years of experience in human resource management," had been serving in a similar position to

that of Deputy Chief, and had far more supervisory experience than that of the plaintiff, even

having supervised the plaintiff for some time.  Def.'s Mem. at 18-19.

　　　　Regarding the plaintiff's attempt to rebut the Agency's explanation for its selection

decision, the only aspects of the plaintiff's candidacy that he identifies as exceeding those of the

selectee include his educational credentials and two years of "classification experience."  Pl.'s

Opp'n at 61.  Indeed, the plaintiff makes a great fuss over the fact that the selectee does not have

a college degree, whereas he holds three degrees.  <u>Id.</u>  The plaintiff points out, and it is

uncontested, that the job description for the Deputy Chief position states, under the category of

education, that a "B.A./B.S. in personnel management, business administration or international

business management is required[,] [and a]  M.A./M.S. is desired."  Def.'s Mem., Ex. 32

(Position Description) at 6; <u>see</u> Pl.'s Opp'n at 61.  The plaintiff glosses over the fact that, by the

plain text of the description, <u>neither</u> he nor the hired candidate fulfills this criterion.  While the

plaintiff holds two "desired" master's degrees, his bachelor's degree was in <u>political science</u>, Pl.'s

Facts Statement, Ex. 2 (Resume of Melvin C. Porter) at 1 (emphasis added), not "personnel

management, business administration or international business management," Def.'s Mem., Ex. 32.  Therefore, the Court finds that the plaintiff merely exceeded the hired candidate in an area where neither candidate satisfied one of the actual designated qualification factors.  And, in the absence of any suggestion that the Agency rendered its selection decision based on impermissible discrimination and "given the dynamic nature of the hiring process," this Court will not "second-guess how an employer weighs particular factors in the hiring decision." Jackson, 496 F.3d at 709; see id. ("'employers are not rigidly bound by the language in a job description'; employer's 'decision to weigh administrative/managerial experience more heavily than the job description suggested [was] simply not sufficient to demonstrate' falsity of employer's qualifications-based explanation" (quoting Browning v. Dep't of Army, 436 F.3d 692, 696-97 (6th Cir. 2006))); see also Lee v. GTE Fla., Inc., 226 F.3d 1249, 1255 n.2 (11th Cir. 2000), quoted in Jackson, 496 F.3d at 709 ("evidence that employer 'changed the importance of the criteria he used in the selection process' did not tend to show that employer's asserted nondiscriminatory explanation was false.").  Similarly, the Court cannot find that the plaintiff's two years of classification experience are determinative of him being the significantly more qualified candidate because that experience occurred fifteen years earlier during his tenure with another agency.  See Pl.'s Facts Statement, Ex. 2 (Resume of Melvin C. Porter) at 3.

Here, where the Agency insists that the criterion of education and classification experience alone were not determinative of its ultimate selection decision, but rather it weighed the "relative qualifications of the candidates, '[this Court] must assume that a reasonable juror who might disagree with the employer's decision[s], but would find the question close, would not

usually infer discrimination on the basis of a comparison of qualifications alone.'" <u>Jackson</u>, 496

F.3d at 707 (quoting <u>Aka v. Wash. Hosp. Ctr.</u>, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc)).

Despite the plaintiff's argument to the contrary, the question of the two candidates'

qualifications is close.  Therefore, it does not appear that the plaintiff was "significantly better

qualified for the job" than was the successful candidate, <u>see</u> <u>id.</u> at 707, or even actually better

qualified.  The plaintiff has not countered the Agency's identification of numerous weaknesses in

his own credentials, or cast doubt upon the proffered strengths of the successful candidate's

credentials.  The Agency maintains that the African-American female who was selected "had, as

of July 3, 2001, over 34 years of experience in human resource management regarding the civil

service rules and regulations," Def.'s Mem. at 18, while the plaintiff had roughly half that level

of experience, Second Am. Compl. ¶ 8.  The Agency also maintains that the successful candidate

had been with the Agency longer than the plaintiff, had experience "acting in a position very

similar to the . . . deputy position at issue in this case" for over a decade, had supervised up to

twenty-five employees as compared to the plaintiff's supervision of nine employees, and, in fact,

had been the plaintiff's supervisor for almost two years.  Def.'s Mem. at 18-19.  Moreover, the

Agency represents that "[during the successful candidate's] tenure at [the Agency], [her] various

positions . . . included [four years as] Chief of the Staffing Branch . . . and [three years as a]

Senior Policy Analyst."  <u>Id.</u> at 18.  In comparison, during his tenure with the Agency, and prior

to his current Administrative Officer position, the plaintiff had been a Supervisory Personnel

Management Specialist for three years, a non-consecutive tenure of approximately two years as

the Deputy Chief of the Recruitment Division, and Acting Chief of the Recruitment Division for

ten months.  Pl.'s Facts Statement, Ex. 2 (Resume of Melvin C. Porter) at 2.  On this record, the

plaintiff has not demonstrated a marked difference between his and the successful candidate's supervisory and management experience.

Further, the Agency states that the successful candidate had "developed personnel-related policies" in several areas, and "performed better in the interview than [the plaintiff] because her responses to questions 'demonstrated broader knowledge in both civil service and foreign service personnel operations and related rules, regulations and procedures which is critical to the function of the position [for which she was ultimately selected].'"  Def.'s Mem. at 18 (citation omitted).  The Agency adds, and the plaintiff has not shown otherwise, that all the candidates for the Deputy Chief position were held to "the same standards . . . using the same interview panel and questions," and the candidate ultimately selected was chosen based on "her skills and abilities, her outstanding performance, her unparalleled institutional knowledge, and because, unlike [the plaintiff], she had held a similar position before and more recently had been acting in the position on a temporary basis." Id. at 19.  Indeed, the sum total of the evidence that the plaintiff has offered in his attempt to rebut the Agency's representations concerning why he was not selected are the three degrees he has acquired, whereas the successful candidate had no degree, and his two "years of position classification experience, [while the person selected had none,] . . . [noting that he had] served as Chief of the Classification Branch for [another government agency,] the Small Business Administration[,]" roughly fifteen years earlier.  Pl.'s Opp'n at 61; Pl.'s Facts Statement, Ex. 2 (Resume of Melvin C. Porter) at 3.  The Court must decline to second-guess the Agency's business decisions upon a record such as the one before it, see, e.g., Stewart v. Ashcroft, 352 F.3d 422, 429-30 (D.C. Cir. 2003) (rejecting the plaintiff's argument that he was "discernibly better" qualified for a supervisory position because he had

many more years of litigation experience as an attorney than the successful candidate), and

therefore cannot conclude that the two factors advanced by the plaintiff made him significantly

better qualified than the successful candidate.

Similarly, the Court cannot find that the Agency's rationale for its selection decision was

a mere pretext for its true motive of gender discrimination.  The plaintiff's conclusory allegations

to the contrary are alone simply too tenuous to raise a genuine issue of material fact that must be

presented to a jury.  Accordingly, the Court must award summary judgment to the Agency on the

gender discrimination aspect of Count V of the plaintiff's second amended complaint.

**D.     Retaliation**

Just as with claims for illegal discrimination, the Court must employ the McDonnell

Douglas burden-shifting test to the plaintiff's claims for retaliation.  Vickers, 493 F.3d at 194.

"To make out a prima facie case of illegal retaliation, [the plaintiff] must show that '(1) []he

engaged in statutorily protected activity; (2) h[is] employer took an adverse personnel action

against h[im]; and (3) a causal connection exists between the two'" events.  Id. at 195 (quoting

Carney v. Am. Univ., 151 F.3d 1090, 1095 (D.C. Cir. 1998)).  Because a causal connection is

often hard to establish in the absence of any direct evidence of causation, to establish this

element of a retaliation claim a plaintiff may submit indirect evidence, including, for example,

evidence of "'very close'" temporal proximity between the alleged act of retaliation and the

purported protected activity.  Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001)

(citing various cases which conclude that a period of three-months or more, by itself, is

insufficient to establish the nexus).

Further, for an act of alleged retaliation to be actionable, it must be an act that would "'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'" Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (citation omitted).  This reasonable person standard has been employed because "[t]he anti-retaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms . . . . [a]nd normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence."  Id. (citation omitted).  In other words, only a plaintiff's claims that relate to Agency's actions which are of the type "likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers" can survive summary judgment.  Id. (citation omitted).

Just as with the application of the McDonnell Douglas test to discrimination claims based on race and gender, once the plaintiff has made this prima facie showing of prohibited retaliation, the Agency must then proffer "some legitimate, nondiscriminatory [i.e., non-retaliatory] reason' for its actions."  Vickers, 493 F.3d at 195 (quoting McDonnell Douglas, 411 U.S. at 802).  Upon such a proffer from the Agency, the plaintiff must establish that the Agency's reason "is [a] mere pretext and thus a 'coverup'" for its true retaliatory motive.  Id. (citing McDonnell Douglas, 411 U.S. at 805).  "In order to prove [that] the [Agency's] explanations for alleged acts of . . . retaliation are pretextual, [the plaintiff] must show 'both that the reason [the Agency provided] was false, and that . . . [retaliation] was the real reason [for the Agency's decision].'"  Weber v. Battista, 494 F.3d 179, 186 (D.C. Cir. 2007) (citation omitted).

The plaintiff has asserted five counts of retaliation that remain unresolved.[13]  These claims include his assertions that the defendant unlawfully retaliated against him (1) by "denying [him a] promotion to the position of GS-15 Supervisory Labor Relations Specialist," Second Am. Compl. ¶ 33 (Count II); (2) by "denying [him a] promotion to the position of GS-15 Administrative Officer within the Agency's Global Bureau," id. ¶ 38 (Count IV); (3) by "denying [him a] promotion to the position of GS-15 Deputy Chief within the Agency's Personnel Operations Division," id. ¶ 43 (Count VI); (4) by "issuing [him] an adverse [mid-year] performance assessment in July 2003," id. ¶ 58 (Count XII); and (5) by "issuing [him] an adverse interim performance assessment in September 2004," id. ¶ 63 (Count XIV).  The plaintiff alleges that the statutorily protected activity that preceded his retaliation claims was his first Title VII lawsuit, Porter I, Pl.'s Opp'n at 4-5, as well as his "numerous administrative grievances and EEO claims against the Agency" that preceded the filing of that lawsuit, Second Am. Compl. ¶¶ 32, 37, 42, 57, 62, and his EEO complaint filed after the resolution of his lawsuit in November 2002, Pl.'s Opp'n at 32.

**1.      The Supervisory Labor Relations Specialist Position**

In Count II of his second amended complaint, the plaintiff alleges that on August 29, 2000, the Agency retaliated against him because of his prior protected activity, the initiation of Porter I earlier that month, when it laterally transferred a Caucasian into the position of Supervisory Labor Relations Specialist.  Pl.'s Opp'n at 11.  The plaintiff contends that the "temporal proximity" of his non-selection with the initiation of his lawsuit, both within the same

---

[13]      As explained above, the principle of res judicata prohibits the plaintiff from relitigating any allegations of retaliation based on the defendant's denial of a performance award to the plaintiff in 2001 (Count VIII), and the defendant's issuance of an allegedly adverse performance assessment with respect to the plaintiff's job performance for 2002 (Count X).

month, raises a genuine issue of material fact as to this retaliation claim, precluding summary judgment for the defendant.  Id. at 55-56.

The Agency responds that the plaintiff cannot maintain this claim for retaliation because its selection decision was made for a legitimate, non-retaliatory reason – because the successful candidate's skills were more commensurate with the position than were the plaintiff's.  Def.'s Mem. at 14-15.  In addition, the Agency maintains that because it held all candidates to the same standards, any retaliation in the selection process was "unlikely," as all candidates were impacted by the weight it attributed to the various skills in the same manner.  Id. at 16.  The Agency also points to the fact that it revisited the vacancy announcement prior to the plaintiff having expressed any interest in that position, so its revision of that announcement is immaterial and does not warrant any inference that the Agency acted with any specific animus toward the plaintiff.  Id. at 17.

The plaintiff rejoins that the Agency's actions demonstrate its pretexual motives because "[he] was markedly better qualified than [the successful candidate] for the Supervisory Labor Relations position," Pl.'s Opp'n at 58, and "the Agency violated established policies and procedures[] to the benefit of [that candidate] and the detriment of [the plaintiff]" by deemphasizing supervisory skills when it revised the vacancy announcement, id. at 56. Specifically, the plaintiff contends that the Agency deliberately revised the job description for the position to exclude someone with his qualifications, and that "[a] factfinder could conclude that supervisory experience was not reflected" in the job description "to the detriment of [the plaintiff] who had vast supervisory experience."[14]  Id. at 56-58.  The plaintiff also maintains that

---

[14]      The plaintiff attempts to buttress his argument for why the successful candidate was less qualified by quoting union representatives not employed by the Agency who had views on the successful

(continued . . . )

the Agency "deliberately sought only non-status employees in order to avoid selecting [the plaintiff]."  Id. at 58.

Mindful of the fact that the prima facie showing of retaliation is not meant to be an "onerous" one, Burdine, 450 U.S. at 253, the Court finds that the plaintiff's allegations that he applied for but did not receive the Supervisory Labor Relations Specialist position within the same month after he initiated Porter I satisfies the required showing of his participation in a "statutorily protected activity," that he was the victim of "an adverse personnel action," and that "a causal connection" exists between these two events, Vickers, 493 F.3d at 195 (internal quotation marks and citation omitted).  Further, as with the plaintiff's other non-selection retaliation claims (Counts IV and VI), this claim refers to alleged conduct, non-selection for a position with a higher pay grade, which objectively is the type of action that would deter a reasonable employee from making a future discrimination claim.  See Burlington, 548 U.S. at 68.

In addressing the plaintiff's discrimination claim with respect to this position, the Court has already set forth what it deems to be the Agency's legitimate, non-retaliatory rationale for its selection of the successful Caucasian candidate for this position – the successful candidate had better tailored qualifications for the position.  See Def.'s Mem. at 15-16.  Specifically, the Agency states that it made its selection because the successful candidate was an attorney who "had practiced law for approximately ten years prior to his selection for the [position]," held a law degree from a prestigious law school, id. at 15, and had experience performing the legally related functions that comprise the duties of the position, see Pl.'s Facts Statement, Ex. 61

---

candidate's qualifications.  Pl.'s Opp'n at 59-60.  This proffer is highly irrelevant, as the plaintiff has not explained how their post hoc opinions are in any way germane to this lawsuit.  Moreover, the plaintiff does not explain how the bulk of what these individuals indicate would be admissible under the Federal Rules of Evidence.

(Supervisory Labor Relations Specialist Vacancy Notice) at 1.  On the other hand, the Agency

maintains that the plaintiff did not have a legal degree, had drafted only one appeal, never

prepared a final agency decision during his career or drafted an agency-level Foreign Service

decision, and had never represented the Agency before the Foreign Service Grievance Board, all

tasks which he would be required to perform if he had been selected for the position.  Def.'s

Mem. at 15-16.  Although the successful candidate may have had less supervisory experience

and tenure at the Agency than the plaintiff, the Agency deemed those factors to be less

important.  Id.  Based on the Agency's proffered reason for the plaintiff's non-selection, the

burden shifts back to the plaintiff to show why the that reason was false and amounted to an

attempt by the Agency to conceal its true retaliatory motivation.   Weber, 494 F.3d at 186.

The plaintiff has failed to meet this burden, having neglected to show how the Agency's

proffered reason for its decision was falsely offered, and that it was designed to cloak its true

retaliatory motive.  Temporal proximity of the Agency's selection decision and the plaintiff's

earlier lawsuit, while it supports the finding of a prima facie case, is not, without more, proof

enough to show that the Agency acted with retaliatory intent.  See Patterson v. Johnson, 505 F.3d

1296, 1299-1301 (D.C. Cir. 2007) (finding that while temporal proximity "could support a jury's

finding of a causal link" to support a prima facie case, the plaintiff ultimately failed to show that

his employer's transfer decision was retaliatory).  And, although the position's description was

revised after it was initially issued, the evidence indicates that it was not the only position

description revised at that time, Pl.'s Opp'n at 57; Ex. 62 (Undated E-mail from Michelle Walker

to Diana Lopez and Robert Ward) (stating that the descriptions for "both of the . . . jobs . . .

need[ed] [to be] adjusted"), and the plaintiff acknowledges that he never expressed to the

selecting official any interest in applying for the position prior to the revision, Def.'s Mem. at 17.

At bottom, the plaintiff has failed to supply the necessary evidence to permit the Court to make

the inferential leap between these revisions and his speculation that the Agency revised the

Supervisory Labor Relations Specialist position description for the purpose of specifically

retaliating against him.

The plaintiff has also put forth no evidence to cause the Court to question the Agency's

contention that all candidates for the position were considered on the same basis as the plaintiff,

see Def.'s Mem. at 16, or that the explanation about the revised position description is designed

to somehow conceal the true responsibilities of that position, which the plaintiff contends were

primarily supervisory, Pl.'s Opp'n at 56-57.  Finally, as already discussed above in addressing the

plaintiff's discrimination claim as to the selection decision for the position, the plaintiff has

offered insufficient evidence to demonstrate that he was significantly more qualified than the

successful candidate.  Therefore, because the plaintiff has ultimately failed to create a reasonable

inference that the Agency's rationale that the successful candidate was better qualified for the job

masked its ulterior and nefarious retaliatory motive against the plaintiff, the Court must award

summary judgment to the Agency on Count II of the second amended complaint.

### 2.      The Administrative Officer Position

In Count IV of his second amended complaint, the plaintiff alleges that in May 2001, the

Agency retaliated against him due to his participation in protected activity, again the litigation of

Porter I, when it laterally transferred a Caucasian employee into the position of Administrative

Officer.  Pl.'s Opp'n at 11.  The plaintiff alleges that the hiring official demonstrated "unlawful

animus towards [him]" by laterally transferring the other employee who was already in a GS-15

grade level position, instead of opening the position to the competitive process for a position that was "a natural progression for a veteran GS-14 Administrative Officer such as [himself]." Pl.'s Opp'n at 62, 65.

The Agency contends that the plaintiff has not established his <u>prima facie</u> case and therefore cannot maintain a Title VII retaliation claim as to his non-selection for the Administrative Officer position because: (1) he cannot show that he was the victim of any adverse action considering that the Agency "had discretion to laterally transfer [the Caucasian employee] into any open position at the same grade level," Def.'s Mem. at 10-11 & n.3, Ex. 19 (ADS § 418.5.8(g) (2001)); (2) the plaintiff "was not eligible for that position as a lateral reassignment," and, in fact, the Agency official who made the reassignment "did not consider any GS-14 employees[, the plaintiff's grade level at that time,] for the position," Def.'s Mem. at 9; (3) the plaintiff "never expressed any interest in the position" when the lateral transfer was made, <u>id.</u>; (4) the plaintiff's argument that he would have been a competitive candidate for the position because his "qualifications do not make him so starkly better qualified than [the transferred candidate]" is based on nothing other than mere speculation, <u>id.</u> at 13; and (5) the plaintiff has not established causation because he challenges an employment decision that occurred prior to the Agency official's awareness of the plaintiff's prior protected activity – the <u>Porter I</u> litigation, <u>id.</u> at 31-32; Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Def.'s Reply") at 5-6. The Agency further contends that even if the plaintiff has established a <u>prima facie</u> case, it laterally transferred the individual selected because

he was better suited for the Administrator Officer position, Def.'s Mem. at 13-14, and therefore the plaintiff cannot maintain this retaliation claim.[15]

It is beyond dispute that the plaintiff's EEO activity and previous lawsuit alleging Title VII violations amount to statutorily protected activities, 42 U.S.C. § 2000e-3(a) (prohibiting discrimination against an employee because he "opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter"), and therefore the defendant challenges the plaintiff's ability to establish the remaining two elements of his prima facie case – that there was an adverse personnel action and causation. Def.'s Mem. at 9-11, 31-32.  Because the Court is satisfied that causation is not the element that poses a barrier to the plaintiff's prima facie case, it will dispose first of that issue before discussing whether the Agency's lateral transfer of another employee caused him to sustain an adverse personnel action.

In assessing whether the causation component of the plaintiff's prima facie case has been satisfied, evidence of the temporal proximity between purported protected activity and the challenged personnel action, as well as the Agency's awareness of the plaintiff's protected activity, are relevant factors that should be considered by the Court.  See Clark County Sch. Dist., 532 U.S. at 273-74 (requiring "very close" temporal proximity between the time of "an

---

[15]     While the Agency urges that because the transferred candidate also had engaged in "prior EEO activity," it is "highly unlikely" that the Agency would have singled out the plaintiff to retaliate against him for the plaintiff's participation in statutorily protected activity, Def.'s Mem. at 14, the transferred candidate's activity appears to have been in the nature of an administrative/investigative participant in an EEO matter, not as a complainant who had filed a grievance, see Def.'s Mem., Ex. 33 (Aug. 26, 2001 Affidavit of Tim Winchell).  Considering that an administrative or investigative role in an EEO proceeding is in no way comparable to the filing of an EEO complaint and a subsequent lawsuit, the logical connection between the two situations is unclear, and the Court will not address the matter further.

employer's knowledge of protected activity and an adverse employment action" (citation

omitted)).  At first blush, the temporal proximity between the date that the plaintiff filed his

complaint in Porter I, August 11, 2000, see Compl., Porter I, Civ. No. 00-1954 (D.D.C. Aug. 11,

2000), and the date of the lateral transfer, May 28, 2001, Pl.'s Opp'n at 62, seems too great to

make any inferential link between the two events.  However, because the plaintiff has alleged

that the statutorily protected activity in which he was engaged included his "filing [of] numerous

administrative grievances and EEO claims against the Agency and [his act of] filing and

successfully litigating the 2000 Lawsuit against the Agency," First Amended Complaint ("Am.

Compl.") ¶ 32 (emphasis added), the Court is satisfied the plaintiff has satisfactorily pled

causation as part of his prima facie case.  This is because a plaintiff's "participation" in a

statutorily protected activity can support a retaliation claim if the plaintiff is discriminated

against for exercising that right.  See 42 U.S.C. § 2000e-3(a) (prohibiting discrimination against

an employee because he "opposed any practice made an unlawful employment practice by this

subchapter, or because he has made a charge, testified, assisted, or participated in any manner in

an investigation, proceeding, or hearing under this subchapter").  And during the time when the

plaintiff continued to pursue his protected activity, he was protected from being retaliated against

based on his pursuit of that activity.  See, e.g., Casole v. Johanns, 577 F. Supp. 2d 138, 140-41

(D.D.C. 2008) (finding that the plaintiff's continuing participation in EEO-protected activity

precluded dismissal of the claim based on lack of causation); See also Deravin v. Kerik, 335 F.3d

195, 204 (2d Cir. 2003) ("defending oneself against charges of discrimination – to the extent that

such defense involves actual participation in a Title VII proceeding or investigation – is

'protected activity' within the scope of § 704(a) [i.e., 42 U.S.C. § 2000e-3(a)] based on a plain

reading of the statute's text.").  Here, for example, the plaintiff contends that although he initiated his lawsuit in August of 2000, he was still actively engaged in that litigation, demonstrated by the fact that he deposed an Agency witnesses in September of 2001, only four months after the selection for the Administrative Officer position was made, Pl.'s Opp'n at 66, which the Court finds clearly establishes the Agency's knowledge of the plaintiff's continued active participation in protected activity.  The Court therefore finds that a sufficient temporal nexus between the plaintiff's participation in Porter I and his non-selection for the administrative officer position exists to permit the inference of a causal relation between the two events.

It is with the adverse employment action element of the plaintiff's prima facie case that difficulty for the plaintiff arises.  First, the Agency's decision not to utilize the competition process was authorized by the Agency's internal policy.[16]  See Def.'s Mem., Ex. 19 (ADS § 418.5.8(g) (2001)).  However, although authorized, such a decision could be actionable as an adverse employment action if it was "tantamount to refusing to promote [the plaintiff]."  Cones v. Shalala, 199 F.3d 512, 521 (D.C. Cir. 2000) ("'no particular type of personnel action [is] automatically excluded from serving as the basis of a cause of action' under Title VII, as long as the plaintiff is 'aggrieved' by the action" (citation omitted)).  While this first potential impediment to the viability of this claim raises concerns, other problems actually doom the plaintiff's ability to maintain it.

A second problem for the plaintiff is the requirement that to maintain this claim, the plaintiff must show that he did what he could to express interest in the position at the time the position was available.  Id. at 518 (citing EEOC v. Metal Serv. Co., 892 F.2d 341, 348 (3d Cir.

---

[16]     See note 11, supra.

1990), for the principle that "[c]ourts have generally held that the failure to formally apply for a job opening will not bar a Title VII plaintiff from establishing a prima facie case of discriminatory hiring, as long as the plaintiff made every reasonable attempt to convey his interest in the job to the employer"); see, e.g., Hussain v. Principi, 344 F. Supp. 2d 86, 97 (D.D.C. 2004) ("Though [the] plaintiff now contends he did want to be Chief of Radiology . . . he does not produce evidence that he conveyed this interest to his superiors." (citation omitted)). The plaintiff contends that he is relieved from this requirement because he "ha[d] no opportunity to express his interest in [the Administrative Officer] position," and that "[]he would have applied" had the position been advertised.[17]  Pl.'s Opp'n at 63 (citation omitted).  While the plaintiff raises a question of fact concerning whether he had an opportunity to apply for the position,[18] he has not raised a question of fact that is material based on the following deficiency that dooms this retaliation claim.

---

[17]     The plaintiff goes so far as to suggest that knowledge of his interest in advancement to the Administrative Officer position should be constructively imposed on the Agency because the selecting official should have known that he was interested in advancing beyond his pay grade level to any GS-15 position.  Pl.'s Opp'n at 64-65.  The plaintiff's position finds no support in existing precedent, nor should it be afforded legal significance.  Acceptance of his position would logically lend itself to the proposition that the plaintiff had or will in the future have constructively expressed an interest in acquiring any GS-15 position filed by the Agency during his tenure as a GS-14 level employee merely because of his continuing advancement aspirations.  Cf. Morgan v. Fed. Home Loan Mortgage Corp., 172 F. Supp. 2d 98, 109 (D.D.C. 2001) (stating that "there must be an available position" which a plaintiff expresses an interest in acquiring before a claim for discrimination can be pursued).  More is needed, and the absence from the record of any actual expression by the plaintiff of his interest in a particular position that he later complains he was not selected casts doubt on the sincerity of the claim and whether it is the mere manufacture of hindsight and creativity.

[18]     The plaintiff testified in his deposition that "he recalled – from reading the Agency's Report of Investigation – an e-mail in which an[other] employee had expressed interest in either a GS-14 or GS-15 Administrative Officer position," and even knew that that person served in that role on a temporary basis, prior to the Agency's decision to fill the position permanently through the lateral transfer at issue.  Pl.'s Opp'n at 64.  The plaintiff now maintains, however, that because there is no evidence that "any other employee expressed interest in the permanent GS-15 Administrative Officer position," as opposed to the temporary position, that his claim should not be defeated by the fact that he did not express interest in the position when it was available.  Id. (emphasis added).  Absent evidence that the plaintiff expressed any

(continued . . . )

Even assuming that the plaintiff has established a prima facie case, he still falls short of adequately rebutting the Agency's legitimate, non-retaliatory reason for its lateral transfer decision.  The Agency has explained that it non-competitively transferred an existing GS-15 grade level employee into the position based on its assessment of his "exceptional credentials and demonstrated excellence in his previous positions."  Def.'s Mem. at 14.  For the reasons already articulated in the Court's analysis of why the plaintiff cannot maintain a claim of racial discrimination with respect to his non-selection for this position, the plaintiff has similarly not established that the Agency's transfer process was an improper pretext for retaliation.  The plaintiff's contention that his six years experience in a similar position at the GS-14 grade level, which was a lower grade level than the level held by the transferred candidate, and that a promotion would have been "a natural progression" for his career, Pl.'s Opp'n at 65, rendered him more qualified than the person who was transferred, are inadequate for the Court to infer that the Agency's implementation of an authorized lateral transfer was utilized for the purpose of retaliating against the plaintiff.  Accordingly, the Court must grant summary judgment to the Agency on Count IV of the plaintiff's second amended complaint.

3.      **The Deputy Chief Position**

In Count VI of his second amended complaint, the plaintiff alleges that in October 2001, the Agency retaliated against him for his participation in prior protected activity, again the litigation of Porter I, when it selected an African-American female for the position of Deputy

---

interest in the position, the Court is hesitant to construe the Agency's decision to laterally staff the position as grounds to relieve the plaintiff of his burden to demonstrate that he expressed an interest in acquiring the position.  And the plaintiff never expressed an interest in the position until after the position was filled on a permanent basis, see Pl.'s Opp'n at 62-64, even though either the temporary staffing of the position alone, or the e-mail in which another employee expressed an interest in filling the position, should have put the plaintiff on notice that the Agency might permanently fill the position.

Chief during the pendency of the <u>Porter I</u> litigation.[19]  Pl.'s Opp'n at 11.  The plaintiff asserts that

the defendant's explanation for its selection decision is pretextual because the successful

candidate was not qualified for the position since she did not have a college degree, an expressed

qualification for the position, <u>id.</u> at 61, while he held three degrees when the selection was made,

Pl.'s Facts Statement, Ex. 2 (Resume of Melvin C. Porter).  The Agency proffers that it selected

the successful candidate based on her credentials, supervisory experience, and her "long and

distinguished career at the [A]gency" and not for a retaliatory reason.  Def.'s Mem. at 18.  The

Agency contends that "there is little or no evidence that the decision makers focused on, or even

recognized th[e] fact" that the successful candidate did not have a college degree.  Def.'s Reply at

10.

       As a starting point for the Court's analysis of the sustainability of this claim, it reiterates

the finding made concerning the plaintiff's gender discrimination claim regarding this same

position and likewise concludes that the plaintiff has satisfied his burden to establish a <u>prima</u>

<u>facie</u> case of retaliation as to the Deputy Chief position.  Namely, that the Agency hired a female

for the position instead of the plaintiff, which was an adverse employment action, during the

pendency of <u>Porter I</u>, which is a statutorily protected activity, one month after his supervisor was

deposed in <u>Porter I</u>, which is sufficiently close in time to reasonably infer a causal connection

---

[19]     The plaintiff also asserts that because the Agency filled the Deputy Chief position twenty days after his supervisor was deposed in <u>Porter I</u>, and that same supervisor supervised the actual hiring official and concurred with that official's decision, that material questions of fact exist as to the supervisor's influence over the selection decision that precludes summary judgment on this claim.  Pl.'s Opp'n at 60. To the contrary, absent any evidence proffered by the plaintiff that the supervisor exerted undue or improper influence over the decision, and did not merely just concur with the hiring official's decision, improper pressure based upon a retaliatory motive would require speculation and cannot reasonably be inferred from the evidence in the record.

between the two events.  Vickers, 493 F.3d at 194.  Therefore, the plaintiff has established his prima facie case of retaliation.

Yet, as the Court explained with respect to the plaintiff's gender discrimination claim concerning the selection decision for the Deputy Chief position, neither the successful candidate nor the plaintiff met the express requirements outlined in the education section of the vacancy announcement for the position.  See Def.'s Mem., Ex. 32 (Position Description).  Moreover, the evidence does not establish that the Agency considered the candidates' educational deficiencies in the final analysis, but rather focused on the nature of their experience and the quality of their performance while employed by the Agency as the factors that formed the basis for its selection decision.  Def.'s Reply at 10-11.  Thus, the legitimate, non-retaliatory explanation the Agency provided for its selection of the successful candidate was that she was better suited for the position.  Id.  In the absence of more persuasive evidence of retaliation in the record, the Court will not question the weight the Agency allocated to the various factors it considered or read an impermissible retaliatory motive into that decision.  Jackson, 496 F.3d at 707 ("Particularly given the dynamic nature of the hiring process, . . . we have also stated that we will not second-guess how an employer weighs particular factors in the hiring decision."); see also Barnette v. Chertoff, 453 F.3d 513, 517 (D.C. Cir. 2006) ("[C]ourts must defer to the employer's decision as to which qualities required by the job . . . it weighs more heavily.").  It is uncontested that the female selected for the position did not have a formal educational background that rivaled the plaintiff's.  However, her supervisory experience – including her supervision of the plaintiff and temporary occupation of the Deputy Chief position – coupled with the quality of her performance as a supervisor were the Agency's proffered reasons for her selection.  Further, the

Court's comparison of the candidates' employment histories, as already set forth above, does not demonstrate that the plaintiff was significantly better qualified.  See discussion at 29-31, supra.  Accordingly, the Court will not second-guess the Agency's business decision nor find that its explanation for the selection decision is merely a pretext for unlawful retaliation against the plaintiff.  The Court must therefore award summary judgment to the Agency on Count VI of the second amended complaint.

   **4.**  **The Plaintiff's 2003 Mid-Year Performance and 2004 Interim Performance Assessments[20]**

   In Counts XII and XIV of the plaintiff's second amended complaint, he challenges his 2003 mid-year performance assessment and his 2004 interim performance assessment respectively.  Specifically, in Count XII, he alleges that the Agency retaliated against him by giving him a mid-year assessment in July 2003 of "borderline unacceptable" performance due to his prior protected activity, the Porter I litigation and his EEO activity.  Pl.'s Opp'n at 9-10.  The plaintiff contends that his supervisor's rationale for this negative assessment of his performance was based on her false representation that the plaintiff "fail[ed] to complete work in a timely fashion."  Id. at 9-10, 48-50.  The plaintiff alleges that the supervisor knew about the Porter I litigation, as well as his November 2002 EEO complaint, evidenced by the fact she submitted an affidavit and an addendum to this submission only several days prior to rendering her negative performance assessment.  Id. at 32-33.  In addition, the plaintiff alleges that the oral assessment was delivered to him in the presence of a senior manager, although the meeting should have included only the plaintiff and one supervisor.  Id. at 10, 30.

---

[20]  The Court will consider these two claims collectively based on their inherent similarities and the fact that they suffer from the same defect which forms the basis for the Court's grant of summary judgment to the Agency on both claims.

Similarly, in Count XIV of his second amended complaint, the plaintiff alleges that in September 2004, the Agency retaliated against him for his participation in the identical prior protected activity when his supervisor provided him with a "Notice of Unacceptable Performance" ("Notice"), id. at 10, without offering, as he opines was also the case for the 2003 mid-year performance assessment, "a single legitimate business reason" for the evaluation, id. at 48.  The plaintiff contends that the Notice "pertained to his 'Executive Support' work objective, and focused specifically on [the supervisor's] allegations that [he] did not complete tasks in a timely fashion," which he contends "were wholly without basis."  Id. at 48.  The plaintiff also contends that "the Notice was accompanied by a Performance Improvement Plan, which entailed a concrete threat of demotion, termination, reassignment or withholding of within grade increases."  Id. at 11.  As with his 2003 mid-year assessment, the plaintiff contends the Agency's rationale for the negative 2004 interim assessment was without merit.  Namely, he alleges that the Notice was "rife with misstatements of fact," including allegations of non-existent "'cost overruns'" and unfounded criticism of his "role in the Agency award process," which were "placed in [his] personnel file."  Id. at 10-11.  The plaintiff alleges that the Notice "foreshadowed [his] 'Needs Improvement' final evaluation [he] received . . . followed by a loss of a bonus."  Id. at 30-31.  The plaintiff contends that both of these assessments amounted to adverse employment actions because they "'well might' dissuade a reasonable worker from making or supporting a charge of discrimination," "render[ed] [him] significantly more vulnerable to an involuntary demotion or separation from the Agency," and resulted in him being "denied eligibility for a bonus and for a promotion."  Id. at 29-30.

The Agency responds that the plaintiff cannot maintain claims of retaliation based on his 2003 mid-year and 2004 interim assessments because "poor performance evaluations are generally not adverse employment actions for purposes of establishing a prima facie case of discrimination or retaliation where, as here, the rating[s] do[] not affect an employee's grade or salary or have other materially adverse consequences."  Def.'s Mem. at 26-27 (citing Russell v. Principi, 257 F.3d 815, 818 (D.C. Cir. 2001); Brown v. Brody, 199 F.3d 446, 458 (D.C. Cir. 1999); Carter v. George Washington Univ., 180 F. Supp. 2d 97, 108-109 (D.D.C. 2001); Mack v. Strauss, 134 F. Supp. 2d 103, 112-13 (D.D.C. 2001)); Weigert v. Georgetown Univ., 120 F. Supp. 2d 1, 17 (D.D.C. 2000).  The Agency asserts that these assessments resulted in "no 'tangible harm' or 'materially adverse consequence'" because they were "provisional and non-final reviews or assessments."  Id. at 28.  The Court agrees.

As to the issue of causation, the plaintiff initiated Porter I in August 2000.  Compl., Porter I (D.D.C. Aug. 11, 2000).  After a trial on the merits and some post-trial proceedings that were resolved adversely to the plaintiff, the District of Columbia Circuit rendered its decision on the plaintiff's appeal in Porter I on July 1, 2005, affirming the District Court judgment. Judgment, Porter I (D.C. Cir. July 1, 2005).  As the Court discussed earlier in its analysis of whether the plaintiff could maintain his retaliation claim based on his non-selection for the Administrative Officer position, because the litigation in Porter I was still in progress when the plaintiff received the two mid-year and interim job performance assessments complained of here, the Court finds that the temporal proximity element of the plaintiff's prima facie case is satisfied. See, e.g., Casole, 577 F. Supp. 2d at 140-41 (finding that the plaintiff's protected activity, which was ongoing when the alleged retaliation occurred, precluded dismissal based on lack of

50

causation); see also Deravin, 335 F.3d at 204 ("[D]efending oneself against charges of

discrimination – to the extent that such defense involves actual participation in a Title VII

proceeding or investigation – is 'protected activity' within the scope of § 704(a)[,] [i.e., 42 U.S.C.

§ 2000e-3(a),] based on a plain reading of the statute's text.").

　　　　However, neither the plaintiff's 2003 mid-year nor his 2004 interim assessment is the

type of personnel action that would objectively deter a reasonable employee from making a

claim of discrimination, Burlington, 548 U.S. at 68, and neither "'affect[ed] the [plaintiff's] grade

or salary,'" or occasioned any other "'significant change in [his] employment status,'" Taylor v.

Small, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (finding that the plaintiff could not establish a

prima facie case of employment discrimination under Title VII based on her low performance

evaluation where it did not "affect[] her grade or salary" and she "did not present evidence

suggesting she suffered any 'significant change in [her] employment status'" (citation omitted)

(some alterations in original)).  Indeed, the 2003 mid-year assessment was delivered orally and

documented in his file "only by the fact of the meeting and not by any particular rating."  Def.'s

Mem. at 28.  This is hardly the type of personnel action that can form the basis for a Title VII

claim.

　　　　On the other hand, the 2004 interim assessment was written and, according to the

plaintiff, placed in his personnel file.  Pl.'s Opp'n at 11.  The plaintiff also contends that both his

mid-year 2003 and interim 2004 assessments contributed to subsequent year-end assessments

and further negative consequences.  Pl.'s Opp'n at 10 ("[T]his [July 2003] rating, which is usually

accompanied by a Performance Improvement Plan, laid the foundation for an annual 'Needs

Improvement' rating . . . at the end of 2003." (emphasis added)); id. at 11 ("As foreshadowed by

this [September 2004] Notice of Unacceptable Performance, Mr. Porter received a 'Needs Improvement' <u>final</u> evaluation in 2004, <u>followed by</u> a loss of a bonus and continued ineligibility for a promotion." (emphasis added)).  Moreover, unlike his 2003 mid-year oral assessment, the plaintiff claims his 2004 "Notice of Unacceptable Performance" coincided with "a Performance Improvement Plan, which entailed a concrete threat of demotion, termination, reassignment or withholding of within grade increases."  Pl.'s Opp'n at 11.  Yet, as the Agency points out, "[t]he 2004 performance plan is not a part of the claims in this case," Def.'s Reply at 14, and indeed, it is the actual assessment that the plaintiff now contests. And, assessments that contain "job-related constructive criticism, which 'can prompt an employee to improve [the employee's] performance'" are not actionable as adverse actions unless a plaintiff can show that they are linked "to financial harms;" meaning that the assessment "could affect [the employee's] position, grade level, salary, or promotion opportunities."  <u>Baloch v. Kempthorne</u>, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (finding that letter of counseling, letter of reprimand, and unsatisfactory performance review were not the type of evaluations that resulted in actionable financial harms); <u>Weber</u>, 494 F.3d at 185-86 (stating that negative performance evaluations "do qualify as adverse actions insofar as they resulted in [the employee] losing a financial award or an award of leave, because a reasonable jury could conclude that such a loss 'could well dissuade a reasonable worker from making or supporting a charge of discrimination'" (citation omitted)).  The plaintiff has made no such showing here.

Specifically, the plaintiff has not shown how the mid-year and interim performance assessments could not have been remedied by improved performance that presumably would have averted any financial harm or other negative employment consequences prior to his year-

end evaluations.  See Russell, 257 F.3d at 818 ("Performance evaluations are likely to be '[i]nterlocutory or mediate decisions having no immediate effect upon employment.'  The result of an evaluation is often speculative, making it difficult to remedy." (citation omitted)).  While it is understandable why the plaintiff is unhappy with the two negative assessments, "not everything that makes an employee unhappy is an actionable adverse action."  Russell, 257 F.3d at 818 (stating performance evaluations are unlikely to be actionable as adverse actions).  Both assessments appear to be among "those petty slights or minor annoyances that often take place at work and that all employees experience."  Burlington, 548 U.S. at 69; accord Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981) (holding that "steps in a process for making such obvious end-decisions as those to hire, to promote, etc." are among those "many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the direct proscriptions of . . . Title VII").  Such is the case with the interim and mid-year assessments of the plaintiff's performance, because alone, neither caused the plaintiff any actionable harm.  As the Agency points out, "a 'mid-cycle review' is not even a rating or evaluation under [the Agency's] rules," and "unless the employee requests otherwise, 'interim evaluations are retained in the operating unit and not submitted to the Office of Human Resources for filing in an employee's Official Evaluation File.'"  Def.'s Mem. at 29.  Although the plaintiff maintains that the Agency put his 2004 interim assessment in his personnel folder, Pl.'s Opp'n at 11, since his grade or salary went unaffected until he received his final 2004 assessment, it is difficult to discern how the plaintiff could maintain that the 2004 interim assessment, and not his 2004 final assessment, is the event that "'affect[ed] [his] grade or salary.'"  Taylor, 350 F.3d at 1293 (citation omitted).  An employment decision which merely "la[ys] the

foundation" for another employment decision which has grade or salary consequences, Pl.'s Opp'n at 10, is not actionable because it had "no immediate effect upon [the plaintiff's] employment conditions," Page, 645 F.2d at 233.  The two interim performance assessments were essentially nothing more than warnings that future negative final assessments could be forthcoming if the plaintiff did not improve his performance, as compared to actions with "direct, measurable, and immediate effect[s]." Russell, 257 F.3d at 819.

The plaintiff also alleges that the presence of a second superior when his 2003 mid-year assessment was provided to him was improper and amounted to an adverse employment action. Pl.'s Opp'n at 10.  However, the record is devoid of any internal "Agency policy," id., or other such authority from which the Court could find that the presence of more than one of the plaintiff's superiors at a meeting to discuss his job performance was improper.  And the Court fails to see how the simple presence of two supervisors, instead of one, somehow rendered the meeting anything other than "private."  Id.  In any event, the presence of the additional supervisor did not amount to an adverse employment action.  Thus, the Court must award summary judgment to the Agency on Counts XII and XIV of the plaintiff's second amended complaint.

## IV.  CONCLUSION

For all of the reasons set forth above, Counts VII, IX, XI, and XIII, as well as on the race discrimination claim asserted in Count V are dismissed with the plaintiff's consent.  In addition, the Court must grant summary judgment to the Agency on the merits with respect to all of the remaining counts of the second amended complaint.[21]

---

[21]     An Order consistent with the Court's ruling accompanies this Memorandum Opinion.

**SO ORDERED** this 9th day of March, 2009.

_____/s/_____
REGGIE B. WALTON
United States District Judge